Lyle H. ADAMS et al., Plaintiffs
and Respondents,

v.

LITTLE MISSOURI MINERALS ASSOCIA-
TION, Inc., a corporation, and
Kye Trout, Jr., Defendants,

Little Missouri Minerals Association, Inc.,
a corporation, Defendant and Appellant.

No. 8258.

Supreme Court of North Dakota.

April 20, 1966.

Rehearing Denied July 1, 1966.

Conmy, Conmy, Rosenberg & Lucas, Bismarck, for defendant and appellant. William S. Murray, Bismarck, of counsel.

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for plaintiffs and respondents.

ERICKSTAD, Judge.

This is an appeal from a judgment entered in October 1964 by the District Court of Golden Valley County in favor of Lyle H. Adams and 40 other plaintiffs against Little Missouri Minerals Association, Inc., a corporation. The appeal "is taken from the whole of said judgment, except insofar as the judgment in said action dismissed the plaintiffs' complaint against the defendant Kye Trout, Jr., individually." A trial de novo is demanded.

The plaintiffs' complaint consists of five separate counts.

Count 1 asked that title to certain real estate be quieted.

Count 2 alleged that the defendants entered into transactions with the plaintiffs whereby the plaintiffs conveyed certain interests in minerals to the corporate defendant in consideration of the issuance of Class A common stock and promissory notes of the corporate defendant, and that said conveyances were obtained by fraud and misrepresentation made by the defendants to the plaintiffs.

Count 3 alleged that prior to the commencement of the action and at various times the plaintiffs entered into agreements and transactions with the defendants wherein certain mineral interests were conveyed to the corporate defendant in exchange for certain shares of Class "A" common stock of the corporate defendants and of its promissory notes, and upon the promise and agreement of the defendants that in the event the corporate defendant had not acquired 30,000 acres of minerals on or before January 1, 1958, the said minerals so obtained from the plaintiffs would be reconveyed to them; that such reconveyance would be made without costs or expense to the plaintiffs; and that said 30,000 acres of minerals were nct acquired by the corporate defendant on or before the aforesaid date.

It further alleged that plaintiffs complied with all of the things required to be done

by them under said agreement, and demanded the reconveyance to them of said minerals, but that the defendants failed and refused and still fail and refuse to convey the same; and that, although not required to do so by said agreement, the plaintiffs tendered and offered to return and restore everything of value received by them from the defendants in connection with such transactions, and still offer to deliver and pay into court for the defendants everything of value received by the plaintiffs in connection with such transactions.

Count 4 alleged that the defendants have received income from the property in issue, that this income is properly the property and income of the plaintiffs, that the defendants have failed to render an accounting thereof, and that the plaintiffs are entitled to an accounting thereof.

Count 5 alleged "that the notes given in part payment of the aforedescribed mineral interests are unpaid and that if rescission or specific performance of the agreements aforesaid is not decreed by the Court, or if it is not decreed that the defendants have no right, title or interest in said premises; that Plaintiffs are then entitled to a lien upon their individual minerals conveyed to corporate defendant for the amount of their individual notes and interest and are entitled to foreclosure thereof and do hereby claim such lien."

The plaintiffs concluded their complaint as follows:

WHEREFORE, Plaintiffs demand judgment as follows:

1. That Defendants be required to set forth all their adverse claims to the above described property; that the validity, superiority and priority thereof be determined; that the same be adjudged null and void and that Defendants be deemed to have no estate or interest or lien or encumbrance on said property and that the title of each individual Plaintiff in and to said property be quieted as to Defendants' claims and that they be forever de-

barred and enjoined from further asserting the same; or in the alternative

2. That the aforesaid transactions wherein minerals were conveyed to corporate defendant be rescinded in equity and that Plaintiffs have judgment for rescission thereof and that said mineral conveyances be delivered up and cancelled subject to restoration to Defendants of all notes, shares of stock and any other thing of value to which Defendants may be entitled upon rescission after making adjustment for any rental income upon the premises received by Defendants and to which Plaintiffs may be entitled; all as determined by the Court; or in the alternative

3. That the Defendants be required to specifically perform their agreements to reconvey said minerals to Plaintiffs and to execute and deliver to Plaintiffs legally sufficient conveyances thereof, upon payment and delivery to Defendants of all shares of stock, notes and other property, if any, to which Defendants may be entitled upon specific performance, after crediting any income from the premises to which the Plaintiffs may be entitled, as determined by the Court, and that in event of Defendants' failure to so re-convey that the Court decree such transfer of title; or in the alternative

4. That each of the Plaintiffs be decreed to have a lien upon the premises by him conveyed for the unpaid balance of purchase price thereof represented by the promissory note of the corporate defendant to each Plaintiff, with interest, that the amount due upon each said note including interest be determined and that Plaintiffs have judgment therefor against the corporate defendant, and that the same be decreed to be a lien upon the premises with respect to which each respective note was issued, and that foreclosure of such liens be decreed.

5. That Defendants be required to account to Plaintiffs for any income re-

ceived from the conveyed premises by Defendants and that Plaintiffs have judgment for the amounts, if any, found to be due them upon such accounting.

6. That Plaintiffs have such other and further relief as may be just and equitable in the premises.

The defendants interposed separate answers, each alleging a general denial and the statute of limitations which they believed applicable. The defendant corporation alleged an additional defense of laches and a counterclaim that it has an interest in the properties and prays that such titles be quieted in it. The plaintiffs generally denied the counterclaims.

The trial court found in favor of the plaintiffs and against the corporate defendant on Count 3. In connection with this point, the trial court in its memorandum opinion said:

CONTRACT TO RECONVEY. This is the remedy which plaintiffs elected to pursue when they caused to be served upon defendant corporation their written demand dated May 13, 1963, wherein they requested a reconveyance of their mineral interests, under the terms of the Company's agreement with each, to reconvey if it did not acquire 30,000 mineral acres by January 1, 1958. Plaintiffs now seek specific performance of such contracts and in that connection have offered to restore everything of value received.

The principal issue is whether defendant did acquire 30,000 mineral acres by January 1, 1958, and this requires a determination as to when certain deeds taken on or before that date were deemed to have been delivered. As related in the foregoing statement of fact, most deeds were made up in the Company's office and were dated as of the date of the agreements to exchange mineral acres for stock. Thereafter, such deeds were signed by the owners, acknowledged before a Notary Public and delivered.

There is conflict in the evidence as to when these physical facts were performed.

\* \* \* \* \* \*

The deeds executed by the plaintiffs in this case were not delivered to defendant Company conditionally. In fact, the agreement signed by each plaintiff recites, "WHEREAS, first party has this date *executed and delivered* to second party a mineral deed \* \* \*". No conditions were imposed under the contracts by the grantors. [Emphasis added by trial court.]

However, note the conditional acceptance of delivery of such deeds as contained in paragraphs (1) and (2).

"(1) Second party agrees to examine title of first party to lands and mineral interests herein above set forth, and if title of first party to said mineral interests and lands is acceptable to second party, second party agrees to issue to first party a stock certificate covering the number of shares of Class A common stock herein agreed to within 60 days from date.

"(2) The second party will not claim ownership of the mineral interests deeded by first party until after stock certificate herein above referred to has been issued to first party and will not record the mineral deed received from first party until after issuance of said stock certificate."

An essential element in delivery of a deed is its acceptance by or on behalf of the grantee.

\* \* \* \* \* \*

So, under the terms of the contract, prepared by defendant Company, the time of acquiring title to the mineral interests in each case, was fixed as the date when the Company issued its stock to each particular party. It can not now claim differently.

According to defendant's records, it had, on January 1, 1958, issued stock for 22,539.70091 mineral acres.

The court accordingly decreed that the corporate defendant reconvey to the plaintiffs the minerals which they had conveyed to the corporate defendant in exchange for the latter's securities. Finding no fraud on the part of Kye Trout, Jr., individually, the court dismissed with prejudice the action against him. The action on the part of plaintiff Guy W. Curl was dismissed without prejudice on Mr. Curl's motion.

The pertinent facts will become apparent as the issues are discussed.

The defendant corporation will hereafter be referred to as Little Missouri Minerals or as the corporation, and the plaintiffs will be referred to as the landowners.

In addition to demanding a trial de novo, Little Missouri Minerals has asserted eight specifications of error. They will be discussed in the order in which they are contained in the defendants' brief.

The first reads as follows:

The court erred as a matter of law in finding as a fact that the plaintiffs, and each of them, have not been guilty of undue delay nor laches in commencing the above action; and that the corporate defendant has not been damaged nor prejudiced by such laches and delay; and the evidence is insufficient to support such finding.

This action was initiated June 12, 1963, approximately 5 years and 5 months after January 1, 1958, which was the date Little Missouri Minerals was to have acquired 30,000 mineral acres. Little Missouri Minerals states that, relying on its ownership of the mineral acres, it incurred indebtedness and issued debentures.

Mr. Trout testified as follows:

Q. (By Mr. Conmy) I asked you to state whether or not through these years since January 1 of 1958 has the corpora-

tion proceeded to act on the determination and conclusions it had made that it was the owner of these mineral acres?

A. Yes.

Q. And has the corporation changed its position and incurred indebtedness and so forth since that time in reliance on that ownership?

MR. KELLOGG: That is objected to as calling for a conclusion.

THE COURT: Overruled.

A. We believe now and we believe[d] then, and we believed ever since then, that we owned the number of acres that our audit showed as of January 1, 1958. And we certainly conducted the corporation's business accordingly on this knowledge that we owned it.

Q. Tell us, did the corporation change its position, and has it incurred indebtedness since that time?

A. Yes, we have.

■ This self-serving statement is insufficient proof that the corporation changed its position and incurred indebtedness in reliance on the assumption that it owned the mineral acres now in dispute.

Reference in the record to the issuance of debentures is even more sketchy. It reads as follows:

Q. (By Mr. Kellogg) But at any rate, the sale of stock or exchange for minerals has been discontinued, hasn't it?

A. The sale, I'd like for you—I don't want to be technical—

Q. I meant to say exchange. I don't —you don't want to be technical.

A. Which stock?

Q. This Class "A" stock.

A. We temporarily discontinued it.

Q. How long has this temporary discontinuation taken, carried on now?

A. When we instituted our debenture registration. The Securities Commissioner asked us to temporarily withdraw exchange.

█ The law of laches applicable to this case was set out in Larson v. Quanrud, Brink & Reibold, 78 N.D. 70, 47 N.W.2d 743, 29 A.L.R.2d 230:

* * * Laches does not arise from mere delay or lapse of time. In addition to the time element, the party against whom laches is sought to be invoked must be actually or presumptively aware of his rights and fail to assert them against a party who has in good faith permitted his position to become so changed that he cannot be restored to his former state. * * *
Larson v. Quanrud, Brink & Reibold, supra, at 753.

This rule has since been followed in Alfson v. Anderson, 78 N.W.2d 693 (N.D. 1956); Wittrock v. Weisz, 73 N.W.2d 355 (N.D.1955); and Grandin v. Gardiner, 63 N.W.2d 128 (N.D.1954).

These requirements are not met in this case. The alleged fraud was not discovered until the landowners employed counsel, who investigated by checking into the activities and records of and pertaining to the corporation.

█ Little Missouri Minerals argues that long delay in the disaffirmance of a contract tends to prove ratification. It alleges that, in addition to long delay, there was also direct ratification by thirteen of the plaintiffs who accepted payment of their notes. Our view of this argument is that the acceptance of payment of the notes is not a ratification or waiver of the landowners' rights if they were not aware of the alleged fraud at the time they accepted payment of the notes. The evidence does not disclose that they were aware of the alleged fraud or of their right to rescind at the time.

Little Missouri Minerals specifically directs our attention to the case of Fedorenko v. Rudman, 71 N.W.2d 332 (N.D.1955), which quoted Bauer v. National Union Fire Ins. Co., 51 N.D. 1, 198 N.W. 546, 549, as follows:

The right to rescind is waived by unexcused delay, although no prejudice or injury be shown as a result thereof. Annis v. Burnham [15 N.D. 577] p. 583, (108 N.W. 549). We think that the respondent, having wholly failed to offer any evidence in justification or excuse of the delay of a year in rescinding the compromise settlement, has not acted with the promptness required by the statute. A delay of four or five months in rescinding, or offering to rescind, after discovering the fraud, has been held to be fatal by the courts of California, construing a statute identical with our own. * * *

█ We think it is important to point out that the court in *Fedorenko* said:

* * * [N]o fixed rule can be laid down as to the time within which a person may rescind a contract, as what may be prompt rescission in one case, would not always be so under the facts of another. * * *

Fedorenko v. Rudman, 71 N.W.2d 332, at 339 (N.D.1955).

In finding that the plaintiffs in *Fedorenko* failed to act promptly to rescind, the court emphasized that on conferring with an attorney in Minot who advised them to see their State's Attorney, they delayed in seeing him for nine months, and that after conferring with him they made no attempt to rescind by any formal action for at least one year and four months.

In the instant case, upon employment of counsel by the landowners, an investigation of the activities and records of the corporation was made by him. Upon his ad-

vising the landowners of their rights, the landowners made a written demand for a reconveyance of their deeds, offering to restore the stock certificates and notes received, as well as money received on notes paid with interest. The landowners requested a reply to this demand within 10 days. When no reply was received, the action was commenced.

■ These facts are considerably different from the facts in *Fedorenko*. Under the facts in this case we conclude that the landowners acted promptly to rescind when they became aware of their rights. Therefore, the landowners are not barred by laches from maintaining their action.

As Little Missouri Minerals has grouped its assignments of error Nos. 2, 3, and 6 together for purposes of discussion, we shall do the same.

2.

The Court erred in finding that the above entitled action was commenced within six years from the date when each and every cause of action stated therein arose; and the evidence is insufficient to support such finding.

3.

The Court erred in its determination and finding that the six year statute of limitations applied to the transaction involved, and in disregarding and not applying the defense of the three year statute of limitations applicable to securities transactions (Section 10–04–17, North Dakota Century Code) which defense was specifically asserted in the pleadings.

6.

The conclusions of law, and all of them, with the exception of conclusions V and VI(d), are erroneously inconsistent with the findings and the evidence, and are further against law and inconsistent with one another; and particularly in that such conclusions necessarily recognize that the transaction between each plaintiff and the corporate defendant was a "securities transaction," and at the same time in the conclusions and the judgment order treats a portion of each of such transactions as a separate contract from the over-all securities transaction; and erroneously applies the general six year limitation statute to each separate portion of the entire securities transaction.

■ Little Missouri Minerals contends that if the landowners' action is not barred by laches, waiver, and ratification, it is barred by the 3-year statute of limitations contained in the Securities Act. Specific reference is made to § 10–04–17, N.D.C.C., part of which is quoted as follows:

Every sale or contract for sale made in violation of any of the provisions of this chapter, or of any order issued by the commissioner under any provisions of this chapter, shall be voidable at the election of the purchaser. * * * Provided:

1. That no action shall be brought under this section for the recovery of the purchase price after three years from the date of such sale or contract for sale nor more than one year after the purchaser has received information as to matter or matters upon which the proposed recovery is based * * *.

Little Missouri Minerals also refers us to § 10–04–15, N.D.C.C., which reads in part as follows:

It shall be a fraudulent practice and it shall be unlawful * * *

3. For any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading * * *.

In disposing of this question in its memorandum opinion the court said:

> The transactions involved in this action did not arise out of any sale or contract for sale made in violation of the provisions of Chapter 10–04–17, N.D.C.C.

> In this action, plaintiffs seek to enforce contracts approved by the Commissioner.

> The limitation therefore has no application * * *.

Little Missouri Minerals contends that the trial court was mistaken in reaching that conclusion. It argues that the offer to sell or to trade corporate stock in exchange for mineral acres was incorporated in the "stock offering" approved by the Securities Commissioner, and that the offer to reconvey the acquired minerals in the event 30,000 mineral acres were not owned by January 1, 1958, was a part of this offer so registered and approved by the Securities Commissioner.

Little Missouri Minerals argues that if there was a violation or breach of contract (as the trial court held in its conclusion that the corporation had not acquired 30,000 mineral acres by January 1, 1958), it was a violation of that part of the transaction which was a securities transaction. It argues that if it was not true, as Little Missouri Minerals stated at a March 1958 meeting of stockholders, that the 30,000 mineral acre requirement had been more than fulfilled, the corporate defendant made an untrue statement of a material fact in connection with the offer and sale of securities, and, in so doing, came within the provisions of Subsection 3 of § 10–04–15, N.D.C.C. That being the case, it maintains, the landowners' action was subject to the 3-year statute of limitations.

We find that Little Missouri Minerals sent a letter to landowners urging them to exchange their mineral acres for Class A stock in the corporation. In the letter it said: "* * * if the corporation does not own on January 1, 1958, 30,000 net mineral acres, all mineral interests will be returned to the owners at the sole expense of the Corporation." A resolution of similar intent was adopted by the Board of Directors on November 3, 1955, and a similar statement was made in a printed brochure which was circulated by the company.

█ These statements were made to induce the landowners to exchange their mineral interests for stock in Little Missouri Minerals. We believe the evidence supports the conclusion that the landowners exchanged their mineral acres for stock in the interval between the making of these assertions and the deadline of January 1, 1958. The statement by Little Missouri Minerals in March 1958 that it owned, as of January 1, 1958, in excess of 30,000 mineral acres, if false, was misleading and a statement in which the Securities Commissioner would have been interested had he known it to have been false. As this matter was apparently not brought to the attention of the Securities Commissioner, or, in any event, as the three years expired without any action being taken under the Securities Act, the remedy to the landowners in this action cannot be under the securities laws but must be separate and apart therefrom.

The landowners agree that their remedy is not under the securities laws but is based on contract and fraud, and thus that the statute of limitations contained in the Securities Act does not apply.

█ Although it has been very difficult to find decisions construing the meaning of the saving clauses of state securities acts (and we have found no decision of this court construing that part of our Securities Act), it is our opinion that Subsection 3 of § 10–04–17, N.D.C.C., permits the landowners in the instant case to bring their action upon either fraud or contract or both. If the action is on contract, § 28–01–16(1), N.D.C.C., which requires that an action upon a contract be commenced within 6 years after the cause of action has accrued, could apply, if pleaded. If the action is based on fraud, § 28–01–16(6), N.D.C.C., if

pleaded, could apply. This subsection reads as follows:

28-01-16. Actions having six years limitations.—The following actions must be commenced within six years after the cause of action has accrued: * * *

6. An action for relief on the ground of fraud in all cases both at law and in equity, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud * * *.

North Dakota Century Code.

In 1936, before Minnesota had a specific statute of limitations incorporated within its Securities Act but while the act contained a saving of existing remedies section, a federal district court, construing Minnesota law, held that purchasers of securities could bring an action in fraud apart from the remedies under the Securities Act. The civil remedies part of their Securities Act at that time read as follows:

Sec. 24. Other actions or rights not limited by act.—Nothing in this act shall limit statutory or common law right of any person to bring action in any court for any act involved in the sale of securities, or the right of the state to punish any person for any violation of any law.

Minn.Sess.Laws 1925, ch. 192.

The court said:

A sale in violation of the Securities Act gives rise to a cause of action for money had and received. Vercellini v. U. S. I. Realty Company, 158 Minn. 72, 196 N.W. 672; Webster v. U. S. I. Realty Company, 170 Minn. 360, 212 N.W. 806. A contract in violation of a penal statute is illegal, and, without proving anything more, recovery may be had. This type of action arising under the Securities Act is commonly referred to as a Blue-Sky action, and obviously when recovery may be had by merely establishing the violation of the securities statute, there

is no purpose in alleging or proving anything more. But the sale of securities may be induced by affirmative representations regarding the alleged compliance with the securities law, and such representations, if material and untrue, may support an action for fraud in equity to rescind, or in law for damages. One cannot say on a motion to quash that a representation that stock is registered under the laws of the state is not a material representation. Whether a stock is registered or unregistered may have an unquestioned bearing upon its market value. Plaintiff alleges that, among other inducing representations, defendant represented by an express statement that it had complied with the securities laws of the state of Minnesota, that he relied upon such representation and was induced to make the purchase, believing such representation to be true. He alleges that such representation was false to his damage. *It is evident, therefore, that plaintiff urges active fraud beyond the failure to comply with the statute. He is not seeking a recovery by reason of any implications arising by reason of a failure to comply with the statute. He charges specific, express statements and representations designed to defraud the plaintiff, and he avers that he did not discover the fraud until after June 1, 1935. It is the court's opinion that, on this motion, the complaint states a cause of action in fraud and that the running of the statute does not commence until the fraud was discovered.* Section 9191, subd. 6, Mason's Minnesota Statutes 1927. [Emphasis added.]

Vogel v. Chase Securities Corp., 19 F. Supp. 564 (Minn.1936), at 566.

In supporting its conclusion the court said:

In discussing the Minnesota statute, section 10407 (Mason's Stat.1927), which makes it an offense in directors to receive deposits in an unsafe or insolvent bank knowing or having good reason to know its condition, the court in Olesen

v. Retzlaff, supra, 184 Minn. 624, at page 629, 238 N.W. 12, 14, 239 N.W. 672, 78 A.L.R. 891, stated:

"The plaintiff's complaint goes further than an action under section 10407. He claims, as to the first five causes of action, that there was actual fraud in the defendants in falsely and with intent to deceive representing that the bank was solvent and had sufficient assets to pay its debts. That there may be actual and actionable fraud justifying a recovery, apart from the statute, and within the meaning of section 9191(6), is without much doubt." * * *
Vogel v. Chase Securities Corp., supra, at 566.

See also: Errion v. Connell, 236 F.2d 447 (9th Cir.1956).

■ Generally, if there is a question which statute of limitations applies, the longer term applies.

* * * [W]here substantial doubt exists as to which of two limitation statutes is applicable, the longer period will be applied. Payne v. Ostrus, 50 F.(2d) 1039, 1042, 77 A.L.R. 531 (C.C.A. 8); Hughes v. Reed, 46 F.(2d) 435, 440 (C.C.A. 10).

Crawford County Trust & S. Bank v. Crawford County, 66 F.2d 971, at 975 (8th Cir.1933).

See also: Keen v. Mid-Continent Petroleum Corporation, 63 F.Supp. 120 (N.D. Iowa 1945).

Whether the landowners have established a cause of action based on fraud or contract or both will be discussed later in this opinion.

Specifications of error Nos. 4 and 5 are considered together by the appellant in its brief:

4.

The Court erred in its finding that the date of issuance of the corporate stock determined the time of delivery to and the time of acceptance by the corporate defendant of the mineral deeds concerned; and the Court in this regard makes an inconsistent but separate finding which is proper (finding No. 13) wherein the Court determines that the date of delivery was the date each particular deed bears.

5.

The Court erred in its finding that on January 1, 1958, the corporate defendant had acquired only 22,539.70 mineral acres; and the evidence is insufficient to support such finding.

Before or at the time the landowners executed their mineral deeds, they entered into an agreement with Little Missouri Minerals as follows:

* * * * * *

WHEREAS, First Party has this date executed and delivered to Second Party a mineral deed covering _____ of the mineral interests owned by First Party in the lands hereinabove described, and

WHEREAS, Second Party has this date agreed to deliver to First Party _____ shares of Class A Common stock for the mineral interests deeded to Second Party by First Party,

NOW THEREFORE, for One Dollar ($1.00) and other good and valuable considerations, the parties hereto agree as follows:

1. Second Party agrees to examine title of First Party to lands and mineral interests hereinabove set forth, and if title of First Party to said mineral interests and lands is acceptable to Second Party, Second Party agrees to issue to First Party a stock certificate covering the number of shares of Class A Common stock herein agreed to within sixty (60) days from date.

2. Second Party will not claim ownership of the mineral interests deeded by First Party until after stock certificate hereinabove referred to has been issued

to First Party and will not record the mineral deed received from First Party until after issuance of said stock certificate.

3. Second Party agrees to pay all expenses and recording fees in connection with examination and transfer of title of mineral interests to Second Party.

4. First Party agrees to cooperate in execution and procurement of title curative instruments and data necessary to clearing title of First Party to mineral interest and lands hereinabove described.

5. First Party agrees that the original copy of the mineral deed executed and delivered this date by First Party may be forwarded with the original copy of this AGREEMENT to the offices of Second Party.

THIS AGREEMENT shall be binding upon the parties hereto, their heirs, successors and assigns.

EXECUTED this day and year first above written.

In regard to this matter the trial court said:

At divers times prior to the commencement of this action, the defendant corporation entered into transactions with plaintiffs and others, whereunder they did convey certain interests in minerals to this corporation in exchange for its class (A) common stock and its promissory notes. In this connection each land owner signed an agreement with defendant company reciting among other things, his ownership of the land, the number of acres conveyed and the number of shares of defendant stock to be conveyed to grantor. Such contract also provided that the Company examine the title, and if acceptable, it would execute and deliver to grantee the designated number of class (A) common stock shares within 60 days. This contract also provided that grantee "will not claim ownership of the mineral interests deeded by first

party until after stock certificate herein above referred to has been issued to first party and will not record the mineral deed received from first party until after issuance of said stock certificate."

At a directors meeting on November 3, 1955, this resolution was passed:

"Resolved that it be a policy of Little Missouri Minerals Association Inc. in the presentation of its programs to advise land owners and prospective stockholders that their mineral interests will be returned to them if the Corporation does not, on or before January 1, 1958, own 30,000 net mineral acres * * *"

This same provision was contained in a prospectus issued by defendant (Plaintiffs' Exhibit 2) and in the letter by the Company to each plaintiff enclosing his share of stock and defendants' note, the latter of which, by its terms, matured 60 days from the date on which the maker acquired ownership to 30,000 mineral acres. The mineral deeds were the type customarily used, were generally made up in the defendant's office as of the date of the contract and then executed and acknowledged by grantors before a Notary Public. * * * There was conflict in the evidence as to when certain deeds were executed, acknowledged and delivered.

At a stockholders meeting on March 29, 1958, Mr. Trout informed the members that as of January 1, 1958, the Company owned 32,040.29098 mineral acres, and its accountant confirmed the fact that on that date the Company owned in excess of 30,000 acres. However, the defendant's records, pertaining to stock issued and the number of acres acquired, disclose that as of January 1, 1958, 22,539.70091 acres were owned by defendant Company.

* * * * * *

On May 14, 1963, these plaintiffs made a written demand upon defendant for a re-conveyance of their minerals, based on

the ground that 30,000 mineral acres had not been obtained by January 1, 1958, in which demand, plaintiffs offered to restore the stock certificates, notes received as well as all moneys received on notes paid, with interest. Plaintiff requested a reply to such demand within 10 days.

This we believe to be an accurate statement of the facts pertinent to this issue, except for the statement that the promise to reconvey was contained in the prospectus which was filed with the Securities Commissioner. Although we do not find this statement in the prospectus, it was contained in a printed brochure which was used by the company to promote the exchange of minerals for stock.

Concerning the promise of Little Missouri Minerals to reconvey, the court in its memorandum opinion said:

This is the remedy which plaintiffs elected to pursue when they caused to be served upon defendant corporation their written demand dated May 13, 1963, wherein they requested a reconveyance of their mineral interests under the terms of the Company's agreement, with each, to reconvey if it did not acquire 30,000 mineral acres by January 1, 1958. Plaintiffs now seek specific performance of such contracts and in that connection have offered to restore everything of value received.

The principal issue is whether defendant did acquire 30,000 mineral acres by January 1, 1958, and this requires a determination as to when certain deeds taken on or before that date were deemed to have been delivered. * * *

The trial court in effect found that delivery of the mineral deeds in law, as distinguished from manual delivery of the deeds, took place at the time the corporation issued its stock to each of the landowners, rather than at the time of the manual delivery of the deed to the corporation. It based its holding on the written agreement entered into by the corporation and the landowners simultaneously with the execution of the mineral deeds by the landowners or which preceded the execution and delivery of the deeds, wherein the corporation in effect stated that it would accept the deed if the title were acceptable to the corporation and that it would not claim ownership of the mineral interests deeded until the stock certificate representing the purchase price of the mineral interests had been issued to the landowner.

Little Missouri Minerals contends that this agreement constitutes an attempt to make a conditional delivery of a grant and that this is prohibited by law. It cites § 47–09–07, N.D.C.C., in support thereof.

47–09–07. Delivery must be absolute —Conditional delivery ineffective, becomes absolute.—A grant cannot be delivered to the grantee conditionally. Delivery to him or to his agent as such is necessarily absolute and the instrument takes effect thereupon, discharged of any condition on which the delivery was made. North Dakota Century Code.

In tracing the history of this statute, our court in a 1939 decision said:

Section 5497 was first enacted in this State in 1877. It appears to have had its origin in Section 403 of the draft of the Field code prepared for the State of New York. The annotations of the commission that prepared the Field code contain a reference to Worrall v. Munn, 5 N.Y. 229, 55 Am.Dec. 330. In that case it was held that a delivery of a deed in escrow cannot be made to the grantee and that if such delivery is in fact made, it becomes, in law, an absolute delivery. In Sargent v. Cooley and Clifford, 12 N.D. 1, 94 N.W. 576, 580, which involves the question of the delivery of a mortgage deed, it is said: "The case shows a delivery of the mortgage, accompanied by oral conditions; and, both under the common law and under our statute (section 3517), such oral conditions were extinguished by the delivery, and the deliv-

ery became absolute. Section 3517, Rev. Codes 1899 [Section 5497, supra], provides that 'a grant cannot be delivered to the grantee conditionally. Delivery to him or his agent as such is necessarily absolute; and the instrument takes effect thereupon discharged of any condition on which the delivery was made.' This section was formulated by the Field code-commission, and embraces the doctrine laid down in Worrall v. Munn, 5 N.Y. 229, 55 Am.Dec. 330, and Braman v. Bingham, 26 N.Y. 483."

After discussing other cases and the contentions of the parties, the court concludes its opinion by saying: "The Legislature of this state deemed it wise to withhold the right to rely upon such conditions where the instrument which would be defeated relates to real estate, and there had been a delivery in fact."

In the syllabus of Ueland v. More Brothers, 22 N.D. 283, 133 N.W. 543, it is held: "Under section 4954 [Rev.] Codes 1905, following holding in Sargent v. Cooley, 12 N.D. 1, 94 N.W. 576, the manual delivery of the deed to the owners' grantees being admitted, the intent of the parties that a condition precedent to its operation shall exist is abrogated by the statute, and such a delivery is absolute, and conveys title to the grantees to whom the same was by the grantor delivered."

The provisions of our statute are identical with those of California from which ours were undoubtedly taken. The case of Mowry v. Heney, 86 Cal. 471, 25 P. 17, 19, decided in 1890, was an action to quiet title brought by the grantee of a deed against a subsequent purchaser at an execution sale who was the judgment creditor of the grantor. Among other things the court found that the grantor, who was dangerously ill and in apprehension of immediate death, desired to make a disposition of her estate at her death. She executed the deed in question and delivered it to the grantee, who was her daughter, with the intent that it would be operative in event of her death from said illness, and that the deed should be inoperative and of no effect in event of her recovery, and that the daughter knew of her mother's intention. In summarizing the findings of the lower court, and commenting thereon, the Supreme Court of California says: "It finds an intention on the part of the grantor that the deed should not take effect, except in case of her death, and that the plaintiff knew of such intention. * * * Its legal effect was to vest in the plaintiff the title to the property free from any conditions. The effect of the finding, if upheld, is to vary the terms of the deed, and render it one upon condition, and defeat its operation by parol proof of an intention on the part of the grantor that it should have an effect different from that apparent on its face. This cannot be done."

\* \* \* \* \* \*

In McGuigan v. Heuer, 66 N.D. 710, 268 N.W. 679, 681, it was claimed by the administrator of the deceased grantor that certain deeds to the wife and sons of the grantor were not delivered; that the grantor did not intend to pass title until after his death, and that the inference from the testimony was that he took that means of disposing of his real estate in order to avoid probate proceedings. In disposing of these contentions, we said: "The deeds were delivered to the wife, and she was the grantee in one of the deeds. A grant cannot be delivered to the grantee conditionally, and, so far as that deed is concerned, the delivery was absolute. Section 5497, Compiled Laws. The record also shows that the delivery of the deeds to the boys was made to the mother for the boys, and she therefore was the agent of the boys to that extent, and delivery to her as their agent is an

absolute delivery. Section 5497, Compiled Laws."
Keefe v. Fitzgerald, 69 N.D. 481, 288 N.W. 213, at 215–216.

The court concluded:

 If the grantor makes a manual delivery to the grantee of a deed absolute in form, intending to part with all authority and dominion over the instrument, he makes an absolute delivery and title passes immediately in accordance with the terms of the deed notwithstanding any intention or understanding that its operation be delayed until the happening of a contingency. * * *

Keefe v. Fitzgerald, supra, at 216.

It is interesting to note that a few other states have reached a different conclusion. In 1931 the District Court of Appeal for the Third District of California quoted the following with approval:

* * * "There is only a conditional acceptance where the purchaser at the time of the execution and delivery of the contract receives a deed, not with the intention of having title vest at that time, but with the intention of retaining the deed and having title vest if the abstract of title shows a merchantable title." 18 C.J. 214, § 123. * * *
Imes v. MacDonald, 113 Cal.App. 427, 298 P. 173, at 176.

In a more recent decision, rendered by the Supreme Court of Texas in 1947, that court said:

This writ of error was granted upon petitioner's point that: "The Court of Civil Appeals erred in holding that the delivery of the deed by respondents to petitioner, the grantee named therein, was not effectual to pass title." In granting the writ we inclined to the view that the challenged holding would trench upon the well-settled rule that there can be no delivery of a deed in escrow to the grantee. This principle is stated in 7 Thompson, Real Property (Permanent Ed.) § 4196: "The delivery of a deed in escrow may not be made to the grantee. The depositary must be a stranger. If the delivery be to the party to whom it is made, though upon express condition, not appearing upon the face of the deed, that it is to take effect only upon certain conditions, whatever may be the form of words, the delivery is absolute, and the deed takes effect immediately."

Chief Justice Stayton applied this rule in Heffron v. Cunningham, 76 Tex. 312, 13 S.W. 259, and it has been consistently followed in this jurisdiction since that decision, the latest expression on the point being found in Denman v. Hall, 144 Tex. 633, 193 S.W.2d 515. Also see 14 Tex. Jur., Deeds, § 61; 17 Tex.Jur., Escrow, § 7.

But further appraisal of the record leads to the conclusion that the Court of Civil Appeals did not in any way qualify this principle. There was no attempt in this case to deliver the deed to petitioner in escrow. Indisputably, what the parties did was to make an executory contract to the effect that Puckett would buy one-half the minerals in question at the agreed price if he found the title was good. He certainly never accepted the deed with the intent that it pass title to him presently. To the contrary, the stipulations in the draft that he handed the respondents necessarily imply that he had thirty days within which to approve the title. * * *

The distinction between delivering a deed in escrow to the grantee and entrusting the manual possession to him without the intention necessary to constitute a delivery has been criticized as somewhat fine by one eminent writer. 1 Williston, Contracts (Rev.Ed.) § 212. Nevertheless, the distinction exists in this jurisdiction and appears to rest upon grounds which are quite tangible and reasonable. Bell v. Rudd, 144 Tex. 491, 191 S.W.2d 841.

The law of delivery of deeds comprehends, among its many elements, an acceptance by the grantee. One should not be obliged to accept an estate without his consent and contrary to his wishes. Precisely, the law as it applies to Puckett's situation is thus written in 26 C.J.S., Deeds, § 51: "Where the grantee imposes certain conditions precedent to acceptance, title does not pass under the deed until the fulfillment of such conditions; and there is only a conditional acceptance where the purchaser at the time of the execution and delivery of the contract of sale receives a deed, not with the intention of having title vest at that time, but with the intention of retaining the deed and having title vest if the abstract shows a merchantable title." See also 16 Am. Jur., Deeds, § 153; 7 Thompson, Real Property (Permanent Ed.) §§ 4116 and 4145.
Puckett v. Hoover, 146 Tex. 1, 202 S.W. 2d 209, at 210–211.

See also: Redmond v. Gillis, 346 Ill. 223, 178 N.E. 504; Chillemi v. Chillemi, 197 Md. 257, 78 A.2d 750.

■ In light of the decisions of this court applying and construing our statute, which makes a delivery of a grant to a grantee absolute and effective as of the delivery and discharges any condition on which the delivery was made, and finding no reasonable basis for distinguishing the cases and no rational basis for holding the statute inapplicable in the case at bar, we are constrained to hold that the title to the minerals was transferred to the grantee as of the date of the manual delivery by the grantor and manual acceptance by the grantee of the mineral deeds. Whether waiver applies will be discussed later in this opinion.

Deeds which were used in the compilation of the acreage as of January 1, 1958, were dated on or before January 1, 1958, but some were acknowledged thereafter. The question thus arises as to what date the deeds were actually delivered.

■ A grant is presumed to have been delivered at its date. § 47–09–06, N.D.C.C.

In construing our statute we have said:

The time of the delivery of the deed is not shown by independent evidence. This fact is not of controlling importance. The statute provides that "a grant duly executed is presumed to be delivered at its date." Section 3516, Rev.Codes 1899 (section 3230, Comp.Laws). In the absence of evidence to overthrow the presumption of delivery as of the date of the deed, the deed speaks for itself, and determines the time of delivery. The statute also settles the question of the correctness of the date of the deed. The presumption is that the deed is truly dated. Subdivision 23, § 5713c, Rev.Codes 1899. These statutory provisions are declaratory of what was the law before they were enacted. "It may be stated as a general rule that prima facie all documents must be taken to have been made on the day they bear date. * * * So a deed is presumed to have been executed (Anderson v. Weston, 6 Bing.N.C. 296) and delivered on the day it is dated." Best on Presumptions, § 133, p. 181; Jones on Evidence, § 45; Ward v. Dougherty, 75 Cal. 240, 17 P. 193, 7 Am.St.Rep. 151.

Leonard v. Fleming, 13 N.D. 629, 102 N.W. 308, at 309.

■ We have held that the evidence to overcome the presumption that a deed in the possession of a grantee was delivered to and accepted by the grantee must be clear and convincing. Cox v. McLean, 66 N.D. 696, 268 N.W. 686.

■ We are of the opinion that the evidence to overcome the presumption that a mineral deed was delivered on the date it bears, rather than on the date it was acknowledged, must also be clear and convincing.

■ The court has said that a deed need not be acknowledged to effectively transfer real property from a grantor to a grantee.

To make a transfer of real property by a deed valid as between the grantor and the grantee, it is not necessary that the instrument be acknowledged.

Bumann v. Burleigh County, 73 N.D. 655, 18 N.W.2d 10, Syllabus 2.

■ The mere fact that a deed was acknowledged on a date subsequent to the date of the deed does not rebut the presumption that the deed was delivered on its date.

■ There is additional evidence to the effect that some of the deeds were not delivered on the dates they bear, but the evidence is insufficient to prove that the corporation did not have title to 30,000 mineral acres by January 1, 1958.

The landowners contend that if, under § 47-09-07, N.D.C.C., the corporation did have a right to immediate passage of title before acceptance thereof, the right or benefit of such law was waived by the agreement not to claim ownership of the mineral interests until the stock certificates had been issued.

■ They refer us to the following section of our Code:

1-02-28. Benefit of provisions of law may be waived.—Except when it is declared otherwise, the provisions of this code in respect to the rights and obligations of parties to contracts are subordinate to the intention of the parties, when ascertained in the manner prescribed by the chapter on the interpretation of contracts. The benefit thereof may be waived by any party entitled thereto, unless such waiver would be against public policy.
North Dakota Century Code.

Their contention is that no rights of innocent third parties nor considerations of public policy are involved that would be affected by this waiver.

■ In view of the language of § 47-09-07, N.D.C.C., which provides that the instrument takes effect on delivery to the grantee discharged of any condition on which the delivery was made, no condition remains. Waiver cannot apply to restore that which has been discharged.

It appears, therefore, that the part of the judgment dependent upon the corporation's failure to acquire 30,000 mineral acres by January 1, 1958, must be set aside unless the landowners have established another basis on which they may prevail.

The landowners claim that the unconscionable character of the transaction warrants a rescission for fraud.

In contending implied fraud, the landowners make the following argument in their brief:

*Implied Fraud.* The records show there were two classes of common stock. The Class B stock was reserved for the organizers—Trout and his associates. The Class A stock was authorized for exchange to Plaintiffs and others for minerals. The disparity in voting and earning rights of the two classes of stock is so marked as to shock the conscience of the Court and, by itself, is sufficient evidence of fraud; although as we will show, there is additional evidence.

In fact, the Class B stock was granted such relative advantages over the Class A stock as to render the latter of little value. These advantages are:

(a) *Voting.* The Class B stock with authorized issue of 20,000 shares had 100 votes per share. Since it was all issued (15,800 to Trout and balance to associates) it had 2,000,000 votes. It was sold to the organizers at 25¢ per share. Therefore an investment of 25¢ gave to a Class B stockholder 100 votes. The Class A stock was exchanged for minerals valued at $15.00 per acre at Defendant's appraisal on the basis of five shares per acre, or a cost of $3.00 per share. The Class A stockholder invested $3.00 to get one vote against 25¢ per 100

votes invested by the Class B stockholder. Thus, the Class B stockholder by investing $3.00 gets (3x4x100) 1200 votes against 1 vote for the same investment of the Class A stockholder, an advantage to the Class B investor of *1200 to 1*.

·(b) *Earnings*. Articles Eighth and Ninth of Defendant's Articles of Incorporation provide the following allocation of earnings between the Class A and Class B common stock. (Exh. 247):

> "The issued and outstanding shares of Class A common stock shall receive 85% of all dividends and other distribution, * * * all of the issued and outstanding shares of Class B common stock shall receive 15% of all dividends and other distribution, etc."

Under this provision the 170,000 shares of presently issued Class A stock representing an investment (at $3.00 per share) of $510,000 get 85% of earnings. The 20,000 shares of Class B stock representing an investment of $5000 (at 25¢ per share) get 15% of earnings.

The ratio of investment in the two stocks is:

$$\frac{\text{Class A} - 510,000}{\text{Class B} - 5,000} = 102 \text{ to } 1$$

But the share in earnings is

$$\frac{\text{Class A} - 85}{\text{Class B} - 15} = 5.7 \text{ to } 1$$

So the Class B stockholder has an advantage over the Class A stockholder in return on investment of

$$\frac{102}{5.7} = 18 \text{ to } 1$$

The same advantage accrues with respect to distributions in liquidation and ownership of assets.

In other words, for each dollar investment the Class B owner receives 18 times the return that the Class A investor receives. * * *

Examination of the features of the stock reveals no other differences between the two classes of stock. The Class B stock is not charged with any obligations. There are no priorities or preferences in favor of the Class A stock.

We believe that this extreme disparity between voting powers (1200 to 1) and earning and liquidation rights (18 to 1 or more) between equivalent investments and risks is sufficient to imply fraud without more proof. See 17A C.J.S. P. 1234 (Contracts § 614); and 17 C.J.S. P. 982 (Contracts § 190); 24 Am.Jur. P. 93 (Fraud and Deceit § 260); and 24 Am. Jur. P. 129 (Fraud and Deceit § 284). In the last mentioned citation the text states:

> "Gross unfairness in a transaction, however, may be ground for a presumption of fraud, and evidence of it alone may be sufficient proof of fraud in equity if the inadequacy is so gross as to shock the conscience."

And in 24 Am.Jur. P. 93, the following:

> "Moreover, the unfairness of a transaction or the inadequacy of consideration is in itself a factor from which fraud can be inferred, and such inference will operate along with other evidence to support a finding of fraud. Inadequacy of consideration has been declared to constitute a badge of fraud, but the mere fact that the consideration was inadequate or that there was an inequality in a contract is not sufficient to raise the presumption of fraud. There may be contracts so extortionate and unconscionable on their face as to raise the presumption of fraud in their inception, or, at least, to require only slight additional evidence to justify such a presumption."

It is true as stated by the Court in its Opinion that this discrepancy in voting rights was disclosed in the small print on the back of the stock certificate, but this instrument was not sent to landowners

until close of the transaction, and there was no disclosure to landowners of the low price (25¢ per share) paid by the promoters for the Class B stock which was given 100 votes per share and 15% of the earnings.

It is interesting to note that, had the corporation exchanged all of its Class A stock for minerals at the rate of $15 per mineral acre, the Class A stockholders would have contributed to the corporation $9,000,000 worth of minerals, while the Class B stockholders would have contributed the sum of $5,000. This is an in-vestment ratio of 1,800 to 1. Thus, while the Class A stockholders would have contributed on the basis of 1,800 to 1, they would have shared in the dividends and the property on liquidation only on a 5.7 to 1 basis.

The prospectus filed with the Securities Commissioner contained the following information concerning the capitalization of the corporation:

*SEVENTH*: The amount, number of shares and par value of the authorized capital stock of the corporation shall be as follows:

| | Amount | No. of Shares | Par Value |
|---|---|---|---|
| (a) Class A Common | $300,000 | 3,000,000 | 10¢ |
| (b) Class B | $ 4,000 | 20,000 | 20¢ |
| (c) Preferred | $200,000 | 20,000 | $10.00 |

*EIGHTH*: Each issued and outstanding share of Class A common stock shall be entitled to one vote at all meetings of the stockholders. The issued and outstanding shares of Class A common stock shall receive 85% of all dividends and other distributions, whether from earnings or surplus, or upon partial or complete liquidation or dissolution, which are declared or paid upon all classes of common stock. No dividends shall be declared or paid upon any stock which is not issued and outstanding.

*NINTH*: Each issued and outstanding share of Class B common stock shall be entitled to 100 votes at all meetings of the stockholders. All of the issued and outstanding shares of Class B common stock shall receive 15% of all dividends and other distributions, whether from earnings or surplus, or upon partial or complete liquidation or dissolution, which are declared or paid upon all classes of common stock. No dividends shall be declared or paid upon any stock which is not issued and outstanding.

In addition to this information, the prospectus contained the following information:

Mr. Kye Trout, Jr., one of the organizers of the Association, subscribed to 15,800 shares of the 20,000 authorized shares of the Association's Class B common stock for a total price of $3,950. Mr. Trout has to date paid $1,950 on this subscription in cash.

Mrs. Mary S. Trout, a director and wife of Kye Trout, Jr., has paid $25 in cash to the Association for which she is to receive 100 shares of its Class B common stock.

Mr. R. L. Bowling, formerly a director of the Association, has paid $25 in cash to the Association for which he is to receive 100 shares of its Class B common stock.

Burns D. Abernethy and Gerald C. Berg, both officers and directors of the Association, have each paid $1,000 in cash to the Association for which they are each to receive 2,000 shares of its Class B. common stock.

There is no evidence to indicate that this prospectus was given to any of the prospective purchasers of the stock, nor is it so contended.

The company did, however, distribute through the mails and at public meetings in its solicitation of the exchange of minerals for stock a brochure entitled "17 Questions About Little Missouri Minerals." Question No. 6 of this brochure contains the following:

6. How is the company operated?

Little Missouri Minerals acquires minerals interests by exchanging Class A common stock for mineral properties. Class A common stock is issued exclusively in exchange for mineral interests and is not sold for cash. The costs of the transfer are paid by the Company and the mineral owner has no cost whatsoever. The Class A common stock owns eighty-five percent of the Company and receives eighty-five percent of all dividends. The only Class A common stock available to prospective purchasers of Company stock and investors will be that stock which individual mineral owners may desire to sell.

\* \* \* \* \* \*

In this brochure there is no reference to the fact that Class B stock exists, nor is there any indication that all of the Class B stock had been purchased by the promoters for much less value than the Class A stock was being exchanged for minerals, and that the Class B stockholders were then in control of the corporation and could continue to control the corporation, even though the great bulk of the assets of the corporation were to be contributed by the Class A stockholders.

In the letter which was sent to landowners soliciting the exchange of their minerals for stock, we note the following with reference to the structure of the corporation:

Little Missouri Minerals Association, Inc. is a Corporation organized under the laws of North Dakota with securities registered under the State Securities Act of 1951. All stock of the Corporation is qualified and registered by the Commissioner of Securities for the State of North Dakota. Little Missouri Minerals issues Class A and Class B common stock. Class B common stock has been subscribed by the organizers-management group, and Class A common stock is exclusively issued to mineral interest owners in exchange for mineral interests. The Corporation does not plan to issue any stock for cash at this time.

Class A common stock which is issued exclusively in exchange for mineral interests has eighty-five percent (85%) ownership of assets and dividends of Little Missouri Minerals Ass'n., Inc. and has sixty percent (60%) of the voting rights. Class B common stock has fifteen percent (15%) ownership of assets and dividends of Little Missouri Minerals and has forty percent (40%) of the voting rights.

Although this letter does indicate that Class B stock exists and that it has been subscribed by the organizers-management group, there is no disclosure in this letter of the pertinent facts indicating that the promotors by buying all of the Class B stock have acquired control of the corporation for the nominal sum of $5,000.

The landowners contend that the statement made as to the voting rights contained in the letter soliciting the exchange of mineral acres for stock constituted actual fraud. The following is the argument made by the landowners relative thereto:

*Actual Fraud.* In addition to fraud inferable from the unconscionable char-

acter of the transactions there are elements of actual fraud present.

Reference is made to statement as to voting rights contained in Exh. 249, the publicity brochure which was used generally by Trout and other solicitors and was mailed out to prospects. This representation reads:

"Class A common stock which is issued exclusively in exchange for mineral interests has * * * 60% of the voting rights. Class B stock * * * has 40% of the voting rights."

This publication did not convey the whole truth; it did not point out that the Class A stock would have 60% of the voting rights, *only in the event the entire 3,000,000 shares were issued,* nor did it point out that the directors having control of the Class B stock could cut off the issuance at any time and thereby preserve their position of control. It conveyed the impression that the 60% control remained in the landowners regardless of amount of stock issued.

The statement contained in the brochure that the Class A stock has 60% of the voting rights as against 40% of the Class B stock was certainly not a true statement at the time it was issued, and has never been a true statement since. It was a misleading statement in the absence of the further statement that this applied only in the event that 100% of the Class A stock were exchanged. It was also misleading in absence of disclosure of the unreasonable advantage the organizers had obtained by the low price to themselves of the Class B stock. Nor was there disclosure that they could and would freeze control in themselves by immediately halting further exchanges and issuance of Class A stock as soon as the qualifying acreage was obtained. It is unlikely that landowners fully informed of this situation would have invested.

There is a duty to disclose in a situation of this kind, and that failure to do so when it becomes operative as a factor in inducing an investment, constitutes fraud. On this subject see 37 C.J.S. [Fraud § 17], Page 251, as follows:

"Fraudulent misrepresentation may be effected by half truths calculated to deceive. A representation, literally true, is actionable if used to create an impression substantially false."

See also 18 C.J.S. [Corporations § 327], Pages 851 and 852, and the following language on Page 852:

"The false presentation may be contained in a prospectus, circular, or other document or advertisement issued or published by the corporation or its officers, or agents to induce the public to subscribe, etc."

and at Page 833 of this text the rule is cited as follows:

"Subject to the conditions and limitations discussed in following subdivisions of this section, a defrauded subscriber or purchaser is entitled, precisely as in the case of fraud between two natural persons, to repudiate or to rescind the contract and to demand a return of the amount he has paid thereon. * * * "

The general principle of liability for fraud by silence is set out in 23 Am.Jur. 851 (Fraud and Deceit, § 76) as follows:

"It is equally competent for a court to relieve against fraud whether it is committed by suppression of the truth—that is, by concealment—or by suggestion of falsehood. The one acts negatively, the other positively; both are calculated, in different ways, to produce the same result. The former as well as the latter is a violation of the principles of good faith. It proceeds from the same motives and is attended with the same consequences; and the deception and injury may be as great in the one case as in the other."

The landowners contend that the corporation thus employed half truth, which, when coupled with the extremely disadvantageous situation from the investment and voting standpoint, is sufficient to warrant the setting aside of these transactions for fraud.

Under a 1959 amendment to our Securities law the sale of the stock in the instant case would today be prohibited. § 10–04–08.1, N.D.C.C.

10–04–08.1. Authority of commissioner as to registration of securities.—The right to sell securities in this state shall not be granted in any case where it appears to the commissioner that the sale of such securities would work a fraud or deception on purchasers or the public, or that the proposed disposal of the securities is on unfair terms, or if the proposed plan of business of the applicant appears to be unfair, unjust, or inequitable. * * *

North Dakota Century Code.

In our view the sale of the securities in the instant case worked a fraud or deception on the purchasers. The disposal of the securities was on unfair terms.

The same session of the Legislature also amended our Securities Law to give the Securities Commissioner control over advertising matter.

Said section reads as follows:

10–04–08.2. Advertising matter—Regulations.—No circular, prospectus, advertisement, printed matter, document, pamphlet, leaflet, or other matter, hereinafter referred to as advertising matter, pertaining to any securities which have been registered in compliance with the provisions of this chapter, or rendering advice with relation thereto, shall be published, circulated, distributed, or caused to be published, circulated, or distributed, in any manner unless and until such advertising matter shall have been submitted in duplicate to the commissioner and approved by him. The commissioner shall not approve advertising matter relating to securities not registered or exempted under the provisions of this chapter. The commissioner shall have power to disapprove any such advertising matter which he deems in conflict with the purposes of this chapter. * * *

North Dakota Century Code.

We are convinced that both the letter and the brochure used by the corporation in the instant case to solicit the exchange of minerals for stock are in conflict with the purposes of our Securities Law as now written and thus clearly could have been prohibited by the Securities Commissioner had these laws been in effect at the time this stock was being exchanged for minerals.

The mere fact that these statutes were nonexistent at the time of the registration of this stock will not prevent this court from granting relief to the landowners in the instant case if the corporation has committed constructive or actual fraud as encompassed by the statute then prevailing.

[21] Fraud under our statutes is either actual or constructive. § 9–03–07, N.D.C.C.

Meritorious as the argument appears that the unconscionable arrangement and classification of the stock in itself constituted constructive fraud, we need not determine this question in the instant case, as we are convinced that actual fraud has been committed by the corporation.

Our statute on actual fraud reads as follows:

9–03–08. "Actual fraud" defined.—Actual fraud within the meaning of this title consists in any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract:

1. The suggestion as a fact of that which is not true by one who does not believe it to be true;

2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though he believes it to be true;

3. The suppression of that which is true by one having knowledge or belief of the fact;

4. A promise made without any intention of performing it; or

5. Any other act fitted to deceive.

North Dakota Century Code.

Our view is that the corporation with knowledge suppressed the truth when it used in its solicitation of the exchange of minerals for stock its brochure which contained the words "The Class A common stock owns 85% of the company and receives 85% of all dividends," and when it used its letter for the same purpose which contained the following:

Class A common stock which is issued exclusively in exchange for mineral interests has eighty-five percent (85%) ownership of assets and dividends of Little Missouri Minerals Ass'n., Inc. and has sixty percent (60%) of the voting rights. Class B common stock has fifteen percent (15%) ownership of assets and dividends of Little Missouri Minerals and has forty percent (40%) of the voting rights.

■■■ The corporation made these statements with knowledge that all of the Class B stock had been subscribed and that at that time control of the corporation was in the Class B stockholders, who could and did prevent the Class A stockholders from ever acquiring the sixty per cent vote ascribed to them in the statement. The suppression of these facts with knowledge of their truth constituted actual fraud. Liland v. Tweto, 19 N.D. 551, 125 N.W. 1032. See also: Equitable Life Ins. Co. of Iowa v. Halsey, Stuart & Co., 312 U.S. 410, 61 S.Ct. 623, 85 L.Ed. 920; Loghry v. Capel, 132 N.W.2d 417 (Iowa 1965); Bean v. Bickley, 187 Iowa 689, 174 N.W. 675; People v. Na-

tional Cancer Hospital of America, 200 Misc. 363, 102 N.Y.S.2d 103; Noved Realty Corporation v. A. A. P. Co., 250 App.Div. 1, 293 N.Y.S. 336; North Star Lumber Co. v. Rosenquist, 29 N.D. 566, 151 N.W. 289.

Had the landowners known that they were to contribute their minerals, which were by far the greatest part of the assets of the corporation, without in reality having any opportunity to control the corporation, it is highly unlikely that they would have exchanged the minerals for stock in the corporation.

The information known to the corporation but designedly suppressed was of such relevant and crucial nature that it should have been disclosed. In failing to disclose this information, fraud was perpetrated upon the landowners.

■■■ When there is nondisclosure of a material fact, or, as stated by the Iowa Supreme Court, when the representation made by the nondisclosure is material, courts permit inferences of inducement and reliance. Loghry v. Capel, supra. See also: Jones v. West Side Buick Auto Co., 231 Mo.App. 187, 93 S.W.2d 1083.

California, with a statute identical to ours, has inferred reliance on fraudulent representations from circumstances.

* * * The fact of reliance upon alleged false representations may be inferred from the circumstances attending the transaction which often times afford much stronger and more satisfactory evidence of the inducement which prompted the party defrauded to enter into the contract than his direct testimony to the same effect. Lucas v. Crippen, 76 Iowa 507, 41 N.W. 205; Taylor v. Guest, 58 N.Y. 262; Baker v. Hallam, 103 Iowa 43, 72 N.W. 419; Kline v. Baker, 106 Mass. 61; Hatch v. Spooner, 59 Hun 625, 13 N.Y.S. 642. * * *

Hunter v. McKenzie, 197 Cal. 176, 239 P. 1090, at 1094.

See also: Gormly v. Dickinson, 178 Cal. App.2d 92, 2 Cal.Rptr. 650; Curran v. Heslop, 115 Cal.App.2d 476, 252 P.2d 378; Thomas v. Hawkins, 96 Cal.App.2d 377, 215 P.2d 495; Mathewson v. Naylor, 18 Cal.App.2d 741, 64 P.2d 979.

■ As the facts suppressed in the instant case were material, inducement and reliance are inferred from the circumstances. It is our view that the landowners would not have exchanged their minerals for stock in the corporation had the suppressed facts been given to them.

Having found that the corporation has committed actual fraud, we must proceed to a further determination of the issues rasied by the appellant corporation before we may ascertain whether the trial court's judgment should be affirmed.

Specification of error No. 7 reads as follows:

The findings and conclusions of law are in error, against law, and unsupported by the evidence, in treating all plaintiffs alike as in a class action; whereas each plaintiff's dealings constituted a separate securities transaction; and in that the evidence offered and received constituted a collateral attack by each plaintiff on their own transaction, as against the corporation, and as against the conveyances made to the corporation by the non-dissenting stockholders, who were not parties to this action, and as against the debenture holders who advanced money to the corporation in reliance upon all of the conveyances that had been made to the corporation.

Specification 7 is now moot in light of the fact that our affirmance of the judgment, as this opinion is now written, is on a basis other than that given by the trial court or that asserted in Specification 7.

Specification 8 reads as follows:

The Court erred in denying the defendants' motion for dismissal, which included the challenge to the jurisdiction of the Court, in that there was a misjoinder of plaintiffs, in that it appears without contradiction that said plaintiffs have no "common source of title," and, further, the venue was not proper.

■ The corporation cites §§ 32–17–03 and 28–04–01, N.D.C.C., which relate to actions to quiet title. These statutes do not apply to actions for specific performance or rescission, which are governed by Rules 20 and 21, N.D.R.Civ.P.

The pertinent part of Rule 20 reads as follows:

(a) Permissive joinder. All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action. All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action. A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities.

If the corporation believed that there was a misjoinder of parties plaintiff, it should have made its motion under Rule 21, N.D. R.Civ.P.

Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on

such terms as are just. Any claim against a party may be severed and proceeded with separately.

█ As the corporation failed to make such a motion, we need consider this specification no further.

█ Having determined that the landowners are entitled to a reconveyance of their mineral interests on the basis of fraud and, as it is necessary in effecting rescission that the landowners return to the corporation the stock certificates, notes, and moneys received on the payment of notes and interest thereon pursuant to the offers and deposits made in court, it follows that the landowners are entitled, not only to a reconveyance of the minerals, but also to a recovery of the rentals paid the corporation for the leasing of the mineral interests while the minerals were in the corporation's name, plus interest thereon at 4 per cent per annum.

The case is therefore remanded to the trial court with instructions that the trial court modify the judgment to provide for the recovery of the rentals plus interest. For the reasons stated herein, the judgment is in other respects affirmed.

TEIGEN, C. J., and STRUTZ and KNUDSON, JJ., concur.

MURRAY, J., not being a member of this Court at the time of submission of the case, did not participate.

On petition for rehearing.

ERICKSTAD, Judge.

A 24-page petition for rehearing, accompanied by a 6-page affidavit signed by Mr. Kye Trout, president of Little Missouri Minerals Association, Inc., and a document entitled "Balance Sheet" and dated May 1, 1963, has been filed by the defendant, Little Missouri Minerals Association, Inc.

Little Missouri Minerals asserts that it bases its petition upon (1) mistakes of fact contained in the Supreme Court opinion; and (2) error in the decision with respect to the statutory provisions of law and controlling principles of law overlooked or not called to the attention of the court.

We shall discuss the points raised by the Corporation which we consider pertinent.

The Corporation contends that the evidence does not warrant a finding of fraud. In support of this contention the Corporation has cited several North Dakota cases to the effect that fraud, including its element of reliance, may not be presumed. Among the cases cited are Steinbach v. Bauclair, 38 N.D. 223, 164 N.W. 672; and Grabow v. Bergeth, 59 N.D. 214, 229 N.W. 282.

The contention of the Corporation is that this court, on the basis of the evidence presented, has presumed fraud and reliance, contrary to the rule stated in the aforesaid cases.

This contention fails to recognize the distinction between a presumption and an inference. In *Grabow* our court held that it was error for the trial court to instruct the jury that reliance on fraud could be presumed, stating: "There is no presumption which obviates the necessity of proving this fact." Grabow v. Bergeth, supra, at 291.

This case is the subject of a case note and text discussion in 37 C.J.S. Fraud § 102, p. 408, which sets out the distinction between presumption and inference as follows:

There is no presumption which obviates the necessity of proving the fact of reliance on the representations made. [footnote 44] Such reliance, however, may be inferred from other facts, although not directly proved * * *.

44. N.D.—Grabow v. Bergeth, 229 N.W. 282, 59 N.D. 214.

The statement relied on by the Corporation, that fraud is not to be presumed, was

contained in a quotation cited with approval in *Steinbach,* which contained the following:

* * * While, to prove fraud direct evidence is not essential, and the inference of fraud may be drawn from facts and circumstances, such inference must not be the guesswork or conjecture of a jury, but the inference must be the rational and logical deduction from the facts and circumstances from which it is inferred. * * *

This statement was incorporated by this court in Syllabus 1 of *Steinbach.*

■■■ In the instant case fraud was not presumed; it was, however, inferred from the facts and circumstances. The employment of inference from established facts to reach a judicial determination is a common and necessary process. This is especially true in fraud cases. See 25 Modern Federal Practice Digest, p. 699, key No. 58 (3):

C.C.A.Ill.1947. Fraud is rarely susceptible of direct proof, but must ordinarily be established by circumstantial evidence and legitimate inferences arising therefrom, which, taken as a whole, will show the fraudulent intent or purpose with which the party acted.

Connolly v. Gishwiller, [7 Cir.] 162 F.2d 428, certiorari denied 68 S.Ct. 166, 332 U.S. 825, 92 L.Ed. 400.

We accordingly adhere to that part of our opinion which held that fraud was inferable from the facts and circumstances.

Another contention of the Corporation is that the quoted argument of counsel for the landowners relating to the alleged unconscionable character of the transaction contained statements of fact and data not included in the record. We have reviewed these arguments of counsel and find that they are substantially supported by the record and that this contention of the Corporation is further without merit for the reason that we did not base our opinion upon the said arguments, as evidenced by the following language from our opinion:

Meritorious as the argument appears that the unconscionable arrangement and classification of the stock in itself constituted constructive fraud, we need not determine this question in the instant case, as we are convinced that actual fraud has been committed by the corporation.

The next point we shall consider is the Corporation's contention that this court made a mistake in fact leading to its ultimate conclusions of law when it said:

In the letter which was sent to landowners soliciting the exchange of their minerals for stock, we note the following with reference to the structure of the corporation: * * *.

The Corporation alleges that this assumes without proof that this letter was sent or delivered to all of the plaintiffs and that the record is to the contrary, because only one stockholder, Robert Still, testified that he received it.

■■■ In respect to this contention, it is our view that under the circumstances of this case, the president of the corporation having acknowledged that in connection with the solicitation of the exchange of minerals for stock the corporation circulated various materials and literature, including the letter and the brochure, partly through the mail and partly by distributing them generally at solicitation meetings, testimony of their receipt by each plaintiff is unnecessary. The Corporation cannot escape the practical consequences of the distribution of this fraudulent material by asserting that each plaintiff must testify as a precedent to his recovery that he received

the material, which was admittedly used and distributed by the Corporation, and which was intended for receipt by him as a prospective purchaser of the stock.

It is also significant to note that when Mr. Trout, president of the Corporation, was asked: "Did you say that the Class 'A' stockholders would have sixty per cent of the voting rights?" his counsel replied: "We concede that revelation was made in the prospectus and other literature in connection with the securities issue."

Mr. Trout on cross-examination admitted that he said in a deposition taken before trial that the letter and brochure were parts of the publicity material the corporation instructed its representatives to use in soliciting exchanges of minerals for stock from the plaintiffs and that pursuant to these instructions this material was generally taken out in the field by the solicitors for this purpose.

Another alleged error on the part of this court is the statement contained in the opinion as follows: "Under a 1959 amendment to our Securities law, the sale of the stock in the instant case would today be prohibited."

As the amendments were made to the securities law subsequent to the original registration of the stock issued by the corporation in the instant case, they are not controlling and were not intended to be controlling. The statement was made to draw attention to the change in the statute which authorized the Securities Commissioner to refuse to register stock that proposed disposal of securities on unfair terms. It was intended that this would discourage the offering of stock on unfair terms in the future by others. The record before us convinces us that the disposal of the securities in the instant case was on unfair terms.

The Corporation alleges that these securities were later reregistered in 1961,

1962, and 1963, and that this refutes our statement that under the amended statute the sale of the stock in the instant case would be prohibited. We have not been able to find the proof of this allegation in the record. It is our view, however, that mere reregistration, if it were accomplished, would not establish that the reregistration was legally proper.

The next contention of the Corporation is that the plaintiffs Charles Davidson, A. J. Gilman, Alfred G. Fasching, Edward H. Meyer, and Donald F. Wischow, all being members of the "Advisory Board of Directors," had full knowledge of the corporate affairs, voting rights, total investments of Class B stockholders, and other matters, all contrary to the Court's holding of concealment of facts. Our search of the record, however, does not disclose that the "Advisory Board of Directors" had knowledge of the fact that the Class A stockholders would have 60 per cent of the voting rights only if all of the Class A stock were issued. A reference to the transcript reveals that Mr. Davidson talked to Mr. Trout about voting rights and that Mr. Trout explained the voting rights to Mr. Davidson, but there is no indication that he explained the voting rights to Mr. Davidson any more fully or any differently than he explained them in his letter or brochure to the prospective purchasers.

A study of the corporate minute book discloses that names were suggested as proposed members of the "Advisory Board of Directors" at a stockholders' meeting held March 29, 1958. The minutes of the meeting do not indicate that these names were selected because these persons had special knowledge of the corporate affairs, but, on the contrary, it appears that they were chosen because of the areas they represented. The minute book does not disclose that the "Advisory Board of Directors" had any special authority which would permit its members access to records and informa-

tion not otherwise available to the other stockholders. In fact, the minutes of that meeting state that Mr. Trout presented the matter of the establishment of this board as an item of business entitled "Creation of Advisory Board of Directors." Mr. Trout asked for the creation of this board "to assist with 'advising and counciling' [sic] in the operation of the company." This does not in any way indicate that the members of the "Advisory Board of Directors" were given or were intended to receive any information other than that given to the other stockholders.

The Corporation urges that the fact that the stock sale proposals were not unconscionable is proved by the actions of Mr. Abernethy, one of the organizers of the Corporation, and members of the "Advisory Board of Directors" in exchanging minerals for stock. In light of what we have previously stated, we do not believe that this point deserves a further comment. It is sufficient to say that we find it difficult to see the relevance of Mr. Abernethy's exchange of minerals for stock. Mr. Abernethy is not a party plaintiff. He could very easily have exchanged his minerals for stock to aid in the promotion of the sale of Class A stock, for as a promoter and an owner of Class B stock, he was part of the group that benefited most from the successful sale of Class A stock. The significance of the actions of the members of the "Advisory Board of Directors" has been previously discussed.

The last point which we shall consider is the contention of the Corporation that: "The Court's opinion overlooks the facts that upon trial, the trial court continually excluded and prevented, and foreclosed the defendants' attempts to examine and cross-examine regarding knowledge that plaintiffs and plaintiffs' witnesses had about their voting rights, and other matters being claimed. In other words, the trial court repeatedly took the position that fraud was

not an issue and that no fraud was committed. (Transcript, pages 458, 459, and 468 through 470) * * *"

Our study of the transcript pages cited in support of the first part of that contention discloses that plaintiffs' counsel objected to a question which was asked to determine what action the witness took subsequent to the conveyance of the minerals to the Corporation and following the receipt of the stock certificates therefor. It did not relate to the witness's knowledge of the corporate structure prior to the consummation of the transaction. It therefore was a matter which, if relative at all, was relative to the question of laches rather than the question of fraud.

The fact that the trial court may have repeatedly taken the position that fraud was not committed resulted more in favor of the defendant corporation than it did in favor of the plaintiffs, for, in most instances, the court's position prevented inquiry on the part of the plaintiffs or prevented presentation on the part of the plaintiffs of testimony or evidence designed to prove fraud.

 Although the trial court's findings of fact are entitled to appreciable weight, on trial de novo we are not bound thereby. We are certainly not bound by such findings when they are based on an erroneous conception of law.

We have reviewed the entire case and all of the evidence and have found actual fraud. We therefore adhere to our original opinion.

TEIGEN, C. J., and STRUTZ and KNUDSON, JJ., concur.

MURRAY, J., not being a member of the Court at the time of submission of the case, did not participate.