Albert STUDE, Plaintiff and Appellee,

v.

Richard C. MADZO, also known as Richard Madzo, Defendant and Appellant,
and
Lorraine D. Madzo, Defendant.

Albert STUDE, Plaintiff and Appellant,

v.

Allan K. RUSTAN et al., Defendants and Appellees.

Civ. Nos. 8956, 8957.

Supreme Court of North Dakota.

March 27, 1974.

Rehearings Denied May 1, 1974.

Sperry & Schultz, Bismarck, and Joseph A. Vogel, Jr., Mandan, for plaintiff Albert Stude, appellee in first action (to compel assignment of contract) and appellant in second action (to quiet title).

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for defendant Richard C. Madzo, appellant in first action.

Greenwood, Moench & Galloway, Dickinson, for defendants Allan K. Rustan, Citizens State Bank of New England, American State Bank of Dickinson, and Maurice P. O'Connell, appellees in second action.

Reichert, Howe & Hardy, Dickinson, for defendants Terry D. Kelsey and Sidni Kelsey, appellees in second action.

VOGEL, Judge.

These two actions are interrelated and were consolidated for trial.

Madzo and his former wife owned about 2,200 acres of ranch land near Medora, in Billings County. They leased it in 1966 to Stude, with an option to buy at whatever price and terms the Madzos agreed on with any other party, an "option of first refusal," as the parties call it.

The option provision of the lease reads:

"In the event lessors intend to sell . . . lessee shall have the option to match any offer communicated to him by lessors, within thirty (30) days . . . according to the same terms of the offer communicated to him, during the terms of this lease . . ."

In 1969, the Madzos notified Stude that they had agreed to sell the property to a named third party for a specific sum, on designated terms, and that he had thirty days within which to meet the price and terms. He was unable to meet the terms out of his own resources and credit. In the course of his search for credit, he came upon O'Connell and Rustan, bankers and ranchers, who entered into a series of contracts with him, the heart of which was an agreement (hereinafter called Exhibit "A") which provided that Stude would exercise his option, that O'Connell and Rustan would put up the money for the downpayment and all subsequent payments, and would "have the full right, title and interest to cause this property to be sold at any time hereafter," that they would lease the property to Stude for a cash rental so long as they owned it, and that the profit on any resale would be divided, one-third each to Stude, O'Connell, and Rustan, but that any loss would be borne by the latter two parties.

Paragraphs 8, 11, and 12 of the agreement read as follows:

"8. It is further agreed by and between the parties hereto that inasmuch as the Second Parties [O'Connell and Rustan] desire to remain in the background during this transaction, and that the First Parties [Albert Stude and Joyce I. Stude] will be the Vendees under the Contract for Deed from Richard C. Madzo and Lorraine D. Madzo, and that said Contract for Deed will be recorded showing the First Parties herein to have an of record interest in the said real estate, that the First Parties herein will execute and deliver to the CITIZENS STATE BANK OF NEW ENGLAND, NEW ENGLAND, NORTH DAKOTA, a Real Estate Mortgage which will be assigned to Second Parties, mortgaging the aforedescribed property, and that the purpose of said Mortgage is to protect the record and the interest of the Second Parties in the aforedescribed real estate, and that it is acknowledged that regardless of the amount cited in the said Mortgage as being due from First Parties to Second Parties, that there shall not be any amount due under said Mortgage, unless the First Parties commit an act designed and intended to deprive the Second Parties of their interest in said real estate, or attempt to jeopardize the Second Parties' interest and ownership of said real estate, then and in that event said Mortgage as recited and executed on the same date hereof between the parties hereto relating to the above described real estate, shall be in effect a valid and binding real estate mortgage, giving to the Second Parties all of the rights and title to them by law and that the First Parties do, by these presents, waive any period of redemption and do grant to the Second Parties the right to foreclose said Mortgage forthwith and take immediate possession of the property after foreclosure of said Mortgage, and do agree to quietly and peaceably surrender to them said property, and further that in lieu of a Promissory Note being executed by the First Parties to the Second Parties that this Agreement shall constitute the Note and the amount due from the First Parties to the Second Parties in the event of breach of the conditions herein as set forth herein shall be the amounts paid out by the Second Parties

to acquire the real estate herein, which includes but is not limited to the amount of down payment in the Contract for Deed which will be executed by and between Richard C. Madzo and Lorraine D. Madzo with the First Parties which is in the amount of $36,250.00. Any Note that is executed by the First Parties to Second Parties relating to this provision and Mortgage shall be subject to the terms and conditions herein and shall not be considered a valid and binding Note of an obligation due unless the First Parties do commit the acts as set forth herein, and that otherwise and upon performance by the First Parties of their part of this Agreement, said Note, as well as the Mortgage mentioned herein, shall be null and void. That this provision is made only in the event that the First Parties herein commit some act calculated to deprive the Second Parties of their interest in the aforedescribed real estate.

.     .     .     .     .     .

"11. It is further agreed that until the Second Parties shall cause the said premises to be sold that Second Parties will cause the real estate taxes to be paid each year and that the Second Parties will bear the relationship of owners and lessors to the First Parties who will bear the relationship of renters and lessees.

"12. It is further agreed by and between the parties hereto that when said property is sold, or when said property is offered to be sold, that the First Parties shall have the opportunity to match any offer communicated to them by Second Parties, within thirty (30) days from the date of receipt of said communication, according to the same terms of the offer communicated to them. If the First Parties do not meet said offer during the thirty day period, then First Parties waive their right to exercise said Option and the Second Parties may cause the premises to be sold to whomsoever they so desire."

Having reached the agreement with O'Connell and Rustan, Stude, through Malloy, an attorney, gave notice to Madzo of his decision to exercise the option in November of 1969.

Along with Exhibit "A," Stude executed at the same time a note and mortgage, absolute in form (but utterly invalid except in case of default of the provisions of Exhibit "A"), and an earnest-money contract with the Madzos containing a provision for the deposit of a contract for deed in escrow pending completion of the down-payment. Concurrent therewith, Stude made an earnest-money payment of $5,000, half of which was advanced by Rustan and half by O'Connell. The balance of the down-payment and subsequent payments were paid by Rustan, through the device of depositing money in Stude's account and having Stude make payments by check or bank draft.

Madzo did not learn until the time of the trial in 1973 of the existence of Exhibit "A." So far as he knew, Stude was buying the property for himself, as he had the right to do under the option provision of the 1966 lease.

All of the documents referred to above (except the 1966 lease) were signed in the office of Malloy, who was attorney for the Federal Land Bank, with whom Stude had had negotiations, and he also was attorney for O'Connell and Rustan in the transactions we have described, as well as being a director of the American State Bank. Malloy drew some of the papers and was present when they were executed by Stude. He never was specifically hired by Stude, never billed him for services, and never was paid by him for any services. Malloy billed Rustan for the work he did in connection with the documents executed in November 1969. Malloy considered that he was representing all the parties (except the Madzos) to the transactions. Similarly, he billed Rustan and was paid by Rustan for subsequent legal services, even when he purported to bring actions in the

name of Stude and to represent him in court and at the taking of depositions and otherwise.

The contract for deed between Madzo and Stude was executed on December 23, 1969. It provided:

> "No assignment of this Contract, . . . by Buyer shall be valid [without the written consent of the Sellers]. . . . Sellers agree that their consent . . . shall not be unreasonably withheld, but that their decision shall be based upon considerations of financial ability and ability to operate the premises."

In November 1970, one year after the execution of Exhibit "A" and the related documents, Stude assigned all his interest in the property to Rustan and entered into a cash lease with him. During the ensuing year, Rustan (through Malloy) attempted to obtain the agreement of the Madzos (now divorced) to the assignment of the contract for deed to Rustan. The campaign to obtain the consent included letters from O'Connell (as chairman of the board of the Citizens State Bank, not as an interested party himself) recommending Rustan as financially responsible, and threats of litigation by Malloy (without specifying for whom he was acting) if the transfer was not agreed to. The campaign was successful as to the former wife of Madzo, but not to Mr. Madzo, who refused to consent. His reason for refusal was that he had heard that O'Connell claimed to own the property, and he knew that his consent to any transfer was required by the contract for deed. To check the accuracy of the rumors he was hearing, he examined the county records and Grazing Association records, but found no transfers from the Studes.

■ Finally, Malloy brought the first action with which we are involved here (Stude v. Madzo), to compel the Madzos to agree in writing to the assignment of the contract for deed. Malloy showed himself as attorney for Stude in the pleadings. Madzo answered and counterclaimed, alleging on information and belief that an assignment had been made without his consent, that such assignment was void, and asking for rescission and cancellation of the contract for deed. Malloy replied in Stude's name, denying knowledge of any assignment or lease or transfer of any kind. Malloy's signature to such a reply is a certification that there is good ground to support the pleading to the best of his knowledge, information, and belief. Rule 11, N.D.R.Civ.P.

In preparation for the trial of the action, Madzo's attorneys took the deposition of Stude. Under oath, Stude, with Malloy present as his attorney, and with Rustan also present, denied having "any written agreement with any other party that [he] would be the operator but that they would be the owner," claimed that he borrowed the money to make part of the down-payment, said that he had made annual payments on the contract for deed from his cattle money, that he never entered into any agreement with O'Connell, either written or oral, that he never signed any kind of document pledging his interest in the contract to any other person or bank, that he never made a deal with Rustan or anyone else "[to] sell [his] ranch and be the operator while they [would] be the owner," and neither O'Connell nor anyone else had an interest in the property. In all of these answers he appears to have committed perjury, in the presence of his attorney who drew the papers which prove the perjury, and in the presence of another party to those contracts.

■ During the taking of the deposition, Madzo's attorney demanded production of the promissory notes Stude admitted to exist, demanded to be informed of any other documents relating to the transaction and that they be produced, and Malloy agreed to produce "whatever I can, what's available." He later produced a promissory note and mortgage, but not Exhibit "A." On appeal, it is claimed that

the mortgage gives notice of Exhibit "A," because it says that the sum secured is to be paid according to the terms of "one Note dated November 13, 1969, subject to the terms and conditions of that certain Agreement dated November 13, 1969." Such a cryptic reference, buried in a three-page document, and referring only to a promissory note, is not notice of the ownership of the property in someone else.

The deposition of Stude was taken on July 17, 1972. Shortly thereafter, Stude made the eminently sensible decision to seek new counsel. His new counsel brought an action to quiet title against Rustan, the Citizens State Bank, the American State Bank, O'Connell, and Terry D. and Sidni Kelsey, to whom Rustan had purported to assign his interest in the property, without the consent of Madzo, and without offering to sell to Stude. This action is the second action with which we are involved and is entitled Stude v. Rustan et al.

The new attorney for Stude also served a notice of rescission purporting to rescind the transactions with O'Connell and Rustan and, alleging that the first action (Stude v. Madzo) was brought for the benefit of Rustan and not Stude, moved to dismiss it. Madzo, discouraged by his understanding (based upon Stude's perjured testimony) that Stude had purchased the property for himself, stipulated with Stude to dismiss the first action. However, the trial court refused to accept the stipulation and consolidated the two cases for trial.

In the meantime, the preparation for the trial of the second action had been progressing. During this period, and unknown to Madzo, Exhibit "A" surfaced for the first time, as part of discovery proceedings in the second action. Madzo was not a party to the second action, and the two actions had not yet been consolidated for trial. While it is true that the possibility of consolidation had been discussed, and the parties to the second action sent notices of the taking of depositions in the second action to the attorneys for Madzo,

the attorneys for Madzo are not deemed to have had notice of proceedings being taken in an action to which their client was not a party, and there is no showing that they had actual notice of Exhibit "A" at any time prior to trial.

The first knowledge of Madzo or his attorneys of Exhibit "A" came during the consolidated trial of the two actions. During the examination of Stude, the first witness, Exhibit "A" was produced along with other documents. When Madzo's attorneys got their first opportunity to cross-examine, they did so and promptly moved for a continuance and for leave to file additional pleadings (on the ground of surprise), and to allege fraud against O'Connell, Rustan, and the two banks, and to amend Madzo's counterclaim against Stude to allege fraud, and to add Malloy as a defendant, and to demand a jury trial. The motions were denied. We conclude that they should have been granted.

◼ Where a party is genuinely surprised by evidence which he could not with reasonable diligence have anticipated, and such evidence is first presented during a trial and in all probability would have a very material effect upon an important issue in the case, the party surprised should be granted a continuance or a new trial or other appropriate relief. McGinnity v. J. I. Case Threshing Machine Co., 38 N.D. 288, 164 N.W. 955 (1917); Citizens' Bank of Drayton v. Schultz, 21 N.D. 551, 132 N.W. 134 (1911). This is not to say that all such claims of surprise will result in the relief requested. As we said in Hamre v. Senger, 79 N.W.2d 41 (N.D.1956):

"Accident or surprise mentioned in the statute as a ground for new trial denotes an occurrence out of the usual course of events which happens suddenly and unexpectedly without any design on the part of the person affected and which ordinary prudence could not have guarded against. . . .

". . . As a general rule, a party asking for a new trial on the ground of

surprise at evidence must have indicated his surprise to the court at the time, and should not have proceeded with the trial and speculated on the chances of a favorable verdict, but should have asked for a delay or a continuance to enable him to overcome the effect of such evidence." 79 N.W.2d at 46, 47.

The attorneys for Madzo were surprised and they followed these admonitions exactly.

We have no doubt that Madzo acted in good faith throughout, and that several of the other parties did not. And he acted diligently. He refused to consent to the assignment of a contract for deed because he suspected that it was part of a fraud upon himself, he defended the action against himself to compel his consent to the assignment, and he took the deposition of his adversary to discover the facts. He was deceived by perjured testimony. He then concluded that he was mistaken in defending the first action and attempted to dismiss it by stipulation. It was only when he was compelled to go to trial as a party to one of the two actions consolidated for trial that his suspicions that he had been deceived were confirmed. At that point he was in the midst of a consolidated trial involving issues which he had no part in framing, which he was not prepared to try, and which involved the existence and legal effect of documents carefully concealed from him for a period of years. A decision adverse to him would not only compel him to consent to the assignment of the contract for deed, but would also determine that the ultimate purchaser had the financial and technical ability to farm the property and, most important of all, Madzo never would have an opportunity to plead or prove fraud in the exercise of the option to purchase. As it turned out, all of these dire events came to pass. After a four-day trial, the trial court ordered Madzo to consent to the assignment of the contract for deed, and it determined that Rustan was the owner of the property in question and that it was of no concern to Madzo where Stude got his "financing."

In denying the motions for continuance and to amend and to bring in an additional party and for a jury trial, and in finding for the plaintiff Stude in the first action and for the defendant Rustan in the second action, the trial court apparently took the position that Madzo's only interest was in making sure that the ultimate purchaser had "financial ability and ability to operate the premises" and that it was not Madzo's concern what "financing arrangements" were made by Stude. The trial judge's opinion is clearly stated in the following excerpt from his statement as to the bases for his decision:

"Now, the first thing that occurred to me and the first thing that I felt that I had to resolve and that was the question of fraud in so far as the Madzo-Stude contract was concerned. There is no question that Stude had made this prior agreement with both Rustan and O'Connell. That was clearly established by the evidence. It's also clear that there was a side agreement, I will call it that, entered into orally between the Studes and Mr. Rustan and Mr. O'Connell that they had at least a year to pay all of these items and get the matter back. However, assuming and taking into consideration that these agreements were in effect and also the side agreement, I am not able to convince myself that that is a material matter in so far as Madzo is concerned. Madzo takes the position that he gave an option to Stude and Stude alone. Madzo testified very clearly the only reason he entered into the contract was because of the option provisions in his lease. I fail to see and I fail to be convinced that the fact that Stude entered into these side agreements or other agreements with other persons has anything or any bearing on whether or not the contract that he obtained from Madzo was or was not legal or valid. The tentative position

that I have taken is that this contract between Madzo and Stude is a valid one notwithstanding any or all of these agreements that were offered in evidence. In other words, Defendant's Exhibit A is of no real consequence in so far as the option that Stude had which he exercised."

We believe that this viewpoint overlooks legitimate rights and considerations of Madzo which have not been pleaded and subjected to evidentiary scrutiny by any trier of fact.

■ We start from the basic premise that any seller has the right to choose his own buyer. Walker v. Galt, 171 F.2d 613 (C.A.5 1948), cert. denied, 336 U.S. 925, 69 S.Ct. 656, 93 L.Ed. 1086, 6 A.L.R.2d 808 (1949). The cases are collected at 6 A.L. R.2d 812 and support the statement in 37 Am.Jur.2d Fraud and Deceit, Section 29, page 54:

"The owner or vendor, however, has the right to select the person to whom he will sell or transfer the property, and he may rescind or sue for fraud if, intending to sell or transfer to one person, he is knowingly deceived as to the purchaser's or grantee's identity and is thus induced to enter into a contract with one to whom he did not intend to sell or transfer the property. Thus, fraud may be predicated upon misrepresentations as to the identity of the purchaser, or as to the person for whom the ostensible purchaser acts, where the vendor would not have entered into the contract had he known the true identity of the purchaser."

The evidence is in dispute as to why Stude, O'Connell, and Rustan agreed to keep secret the identity of the purchasers. It may be that they knew or suspected that Madzo would not sell to O'Connell and Rustan, or it may be that entry of O'Connell and Rustan into the bidding would have caused the price to go higher, and they collusively determined to prevent competitive bidding. It may be, as Rustan indicated, that the purpose was to protect Stude from some unspecified hostility of neighbors. These are matters which are material to the question of whether a fraud was committed upon Madzo, whether he relied upon the false representation that Stude was the purchaser, whether he would have sold to Rustan and O'Connell directly, and whether he was damaged. These are matters which Madzo should be allowed to litigate.

■ There can be fraud without the making of positive false statements. Section 9–03–08, N.D.C.C., lists several kinds of acts which, when committed by one party to a contract, or with his connivance, with intent to deceive another party or to induce him to enter into the contract, constitute "actual fraud." Such acts include "the suggestion as a fact of that which is not true by one who does not believe it to be true," "the suppression of that which is true by one having knowledge or belief of the fact," and "any other act fitted to deceive."

In Adams v. Little Missouri Minerals Assn., 143 N.W.2d 659 (N.D.1966), we stated, in paragraph 18 of the syllabus:

"The suppression of that which is true by one having knowledge or belief of a fact by a party to a contract, with intent to deceive another party thereto or to induce him to enter into the contract constitutes actual fraud."

In the same case, we held that inducement and reliance may be inferred when the representation made by nondisclosure is material. Vide, par. 20 of syllabus. And see Verry v. Murphy, 163 N.W.2d 721 (N.D. 1968).

■ During the trial, the attorneys for Madzo attempted to inquire of him whether he would have entered into the contract for deed if he had known the true identity of the purchasers. Questions tending to elicit answers to indicate that the identity

of the purchasers was not of interest to him also were asked. Objections to such questions were sustained as "conclusions."

Upon a retrial, such inquiries should be permitted. Wigmore on Evidence, 3d Edition, Section 581, states that it is a "practically unanimous" rule that one can testify to his own intent where intent is a material issue. Among the hundreds of cases cited by Wigmore are State v. Tough, 12 N. D. 425, 96 N.W. 1025 (1903). Of course, upon a retrial, the other parties, including Stude, O'Connell, and Rustan, likewise may testify as to their own intent or motive in entering into the agreement marked Exhibit "A."

We reverse, and these two consolidated actions are remanded to the district court with directions to grant the motions of Madzo to amend, to add a party, and for a jury trial, and for further proceedings consistent with this opinion.

The clerk of this court is directed to send copies of this opinion to the State's Attorney of Stark County, to the Grievance Commission of the North Dakota Supreme Court, and to the Department of Banking and Financial Institutions.

ERICKSTAD, C. J., and TEIGEN, KNUDSON and PAULSON, JJ., concur.

VOGEL, Judge, on petitións for intervention and rehearing.

Harry L. Malloy has filed a petition to intervene and a petition for rehearing in which he asserts: that he did not violate Rule 11, North Dakota Rules of Civil Procedure, that he acted as Attorney for Stude with Stude's knowledge and authority, that he recommended to Stude that he seek other counsel when a conflict of interest appeared, and that Malloy was taken by surprise by Stude's apparent perjury but could do nothing to expose it because of his attorney-client relationship.

He further states that he did bill Stude for services but was told to send the bill to Rustan and did so, and that he heard that Stude, Rustan, and O'Connell had made an oral agreement among themselves and he concluded from this that Exhibit A (which he prepared but did not see "fully executed") was not binding, and that since Stude attempted to assign his interest to Rustan alone he assumed that O'Connell had no interest in the land in question and therefore Malloy could properly sign a reply denying Madzo's allegation that O'Connell claimed an interest in the land.

Our opinion, of course, is based on the record of the trial, including a deposition of Mr. Malloy. The motion is denied.

A petition for rehearing was filed by defendants-appellees Rustan, O'Connell, and the two banks. It reargues matters adequately briefed and argued by the parties prior to our opinion. It is denied.

ERICKSTAD, C. J., and TEIGEN, PAULSON and KNUDSON, JJ., concur.