FIRST NATIONAL BANK AND TRUST COMPANY OF BISMARCK, Appellee,

v.

Donald P. PETERSON, Appellant.

No. 83–1400.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 13, 1983.

Decided Nov. 9, 1983.

Stephen W. Plambeck, of Nilles, Hansen, Selbo, Magill & Davies, Ltd., Fargo, N.D., for appellee.

Gainsley, Squier, Thorsen & McTaggart, Phillip Gainsley and Jane A. McTaggart, Minneapolis, Minn., for appellant.

Before BRIGHT, JOHN R. GIBSON and FAGG, Circuit Judges.

BRIGHT, Circuit Judge.

The First National Bank and Trust Company of Bismarck (the "Bank") brought this action to collect on a $1,601,972.47 promissory note, on which Donald P. Peterson had paid only $86,901.52 before defaulting. Peterson contended that the Bank had fraudulently induced him to give the promissory note, and that therefore he was not liable on it. Peterson counterclaimed to recover the $86,901.52 he had paid before default.

The district court,[1] sitting without a jury, found no support for Peterson's allegation of fraud, and awarded the Bank $2,075,106.67, representing the entire outstanding principal on the note plus interest. The district court dismissed Peterson's counterclaim. Peterson appeals.

Having reviewed the whole record, we find ample support for the decision of the district court. Accordingly, we affirm.

I. *Background.*

In 1977, Peterson, a one-third owner of Nastrom-Peterson-Neubauer (NPN), a heavy equipment dealership, gave the Bank a personal guaranty to cover the $1,000,000 line of credit the Bank extended to NPN. The guaranty followed the Bank's standard form, under which the guarantor assumed responsibility for "all * * * indebtedness and liabilities of whatsoever nature" owing to the Bank from the debtor. Peterson had previously executed identical guaranties to the Bank to cover the Bank's extension of first $300,000, then $500,000, in credit to NPN. The 1977 $1,000,000 guaranty replaced the previous guaranties. NPN sought the increase in its line of credit from $500,000 to $1,000,000 because Komatsu, a heavy equipment manufacturer, requested that NPN increase its line of credit to $1,000,000 as a precondition of NPN's becoming a Komatsu distributor. The guaranty Peterson executed contained no provisions suggesting that Peterson's liability under it was limited to NPN's Komatsu-related borrowing. Even after becoming a Komatsu distributor, NPN continued to handle other manufacturers' equipment, and to finance those purchases through the Bank under the $1,000,000 line of credit.

In the fall of 1979, the Bank made its first demands on Peterson under the $1,000,000 guaranty, to cover defaults on various non-Komatsu leases and contracts NPN had assigned to the Bank. Peterson resisted the Bank's demands, asserting that his obligations under the guaranty extended only to NPN's Komatsu-related borrowing, not to any of the business's other debts, notwithstanding that no provision of the guaranty expressly limited the guarantor's liability to the financing of Komatsu purchases. Peterson's lawyers requested on a number of occasions that the Bank produce copies of any documents in its possession relating to the $1,000,000 guaranty.

Peterson had various other sizable debts to the Bank and other institutions. On January 17, 1980, he negotiated a settlement with the Bank under which it would assume, renew, or reduce the interest on various loans Peterson had taken out. Also as part of the settlement, Peterson agreed to pay the Bank $700,000 as a compromise satisfaction of the $1,000,000 NPN guaranty. The promissory note on which the Bank seeks to collect in this lawsuit covers both the $700,000 guaranty compromise and various other obligations of Peterson to the Bank under the settlement.

Peterson paid four installments on the note, then defaulted. Several months after his initial default, two of his lawyers discovered three documents in the Bank's files, while conducting research relating to other pending litigation:

(1) a May 27, 1977 letter from Owen Noteboom, a Bank vice-president, to an officer of the Bank of North Dakota ("BND") (which would participate with the appellee Bank in the $1,000,000 line of credit), containing the following language: "They [NPN] have recently received the Komatsu franchise after deciding to expand their facilities. This will require an additional $5000000.00 [sic] for Wholesale financing."

(2) a July 12, 1977 letter from a BND officer to Noteboom, confirming BND's decision to participate "in the floor plan note to Nastrom, Peterson & Neubauer, Inc."

(3) a Bank loan committee memorandum, dated May 17, 1977, describing the

---

**1.** The Honorable Paul Benson, Chief Judge, United States District Court for the District of North Dakota.

contemplated $1,000,000 line of credit, including the following notation under the heading "General Information": "Increase from 500,000 to 1,000,000 = for the Floor Planning of Komatsu tractors."

The Bank does not deny that it failed to produce these three documents for Peterson's inspection during the fall 1979 dispute over Peterson's obligations under the guaranty. Peterson now contends that the Bank's failure to produce these documents was knowingly and intentionally deceitful, that had the Bank produced them during the settlement negotiations he would never have entered the settlement agreement or given the promissory note, and that the note is void and unenforceable on account of fraud in the inducement.

## II. *Discussion.*

■ At the outset, we reject Peterson's argument that Fed.R.Civ.P. 52(a)'s "clearly erroneous" standard of review does not apply in this case.[2] This is not a case in which the bulk of the evidence is documentary. The trial lasted more than two days, and the trial transcript runs well over 500 pages. Resolution of the controverted issues in the case, moreover, depends largely on the credibility of the witnesses who testified.

■ To establish fraudulent inducement as a defense, Peterson must prove that the Bank's representatives suppressed the three documents knowingly and with intent to deceive. N.D.C.C. § 9–03–08.[3] Peterson must then prove that had he known of the documents' contents on or before January 17, 1980, he would not have given the promissory note. *Verry v. Murphy,* 163 N.W.2d 721, 732 (N.D.1968).[4] The record before us

contains nothing but the testimony of the Bank's lawyers and officers that might show whether the Bank concealed the documents knowingly and with intent to deceive. Because that testimony is to some extent ambiguous and contradictory, the credibility of the various witnesses becomes crucial. Similarly, Peterson's claim of reliance stands or falls on the materiality of the documents and on the credibility of his assertions, and those of the lawyer who advised him at the time, that they would never have agreed to the January 17, 1980 settlement had they seen the three documents. The trial court, which heard and saw the witnesses testify, stands in a far better position than we to say what testimony was credible. Accordingly, we will reverse the trial court's finding only if, on the record before us, clear error appears.

■ North Dakota law requires clear and convincing evidence to prove fraud. *Verry v. Murphy, supra,* 163 N.W.2d at 733. The testimony as to the Bank's representatives' knowledge of the existence of the three documents, and of those representatives' deceitful intent, is anything but clear. We cannot say the trial judge erred in ruling that Peterson had not proved the requisite knowledge and intent by clear and convincing evidence. Put another way, our review of the record does not leave us with "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Hoefelman v. Conservation Commission of the Missouri Department of Conservation,* 718 F.2d 281, at 285 (8th Cir.1983).

■ Likewise, we do not think the trial court committed clear error in rejecting Pe-

---

2. Fed.R.Civ.P. 52(a) provides, in part, that in actions tried upon the facts without a jury, [f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

3. Peterson does not allege constructive fraud, which under N.D.C.C. § 9–03–09 requires no showing of "an actually fraudulent intent."

4. The fact of inducement and reliance may be inferred from the facts and attending circumstances of the transaction. *Verry v. Murphy, supra,* 163 N.W.2d at 731, *citing Adams v. Little Missouri Minerals Association,* 143 N.W.2d 659 (N.D.1966). But reliance depends, of course, on the materiality of the nondisclosed information; if the information is only tangentially material, its suppression may not be enough to support an inference of reliance and inducement.

terson's reliance claim. Peterson himself testified to his extensive business experience, and that he had served for many years on the board of directors of another bank affiliated with the appellee Bank.. He admitted longstanding familiarity with the Bank's guaranty form and with standard commercial lending practices. Therefore his claim that he thought his obligations as guarantor differed from those actually set forth in the guaranty form he signed, was subject to rejection by the trial court. Taking the experience of Peterson and his lawyer into account, the trial court was free to discount their assertions that had they had knowledge during the negotiations of the three documents in question, they would not have agreed to the settlement.

We observe, furthermore, that the three documents, though they indicate that the lending banks understood the use to which NPN intended to put the money it borrowed, say nothing to suggest that Peterson's guaranty was limited to obligations arising from that use. The documents in question, in fact, say nothing at all about the terms of the guaranty. Nor has the Bank ever disputed the only fact the documents clearly show—that NPN's motivation in seeking an increased line of credit was to finance its new Komatsu operations. The materiality of the documents to the issue of Peterson's obligations under the guaranty (as distinguished from the issue of NPN's obligations under the loan agreement) is thus somewhat questionable.

We express no view as to whether under North Dakota law the documents would be admissible to vary the terms of the guaranty instrument, or as to whether, if admissible, they vindicate Peterson's assertion that the parties intended the guaranty to cover Komatsu-related borrowing only. We comment on the documents' contents only because we think them probative of the question of fact whether Peterson would have entered the settlement had he seen the documents beforehand. Having heard the testimony of Peterson and his lawyer, the trial court decided this question in the Bank's favor. Nothing in the content of the three documents persuades us that the trial court

erred in so deciding. The trial court's credibility determination must therefore stand.

Peterson also alleges that the trial court erred in quashing a subpoena served upon the Bank during trial, seeking the production of documents that Peterson had not listed as exhibits in advance of trial as required by the pretrial order. On the basis of our examination of the relevant portions of the trial transcript, we conclude that the trial judge acted within his discretion in quashing the subpoena.

Accordingly, we affirm the judgment of the district court.